UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**WILMINGTON SAVINGS FUND SOCIETY, FSB,**

   Plaintiff,

v.                                  No. 4:23-cv-00895-P

**JOHNNY MATEO BARRON, ET AL.,**

   Defendants.

## MEMORANDUM ORDER & OPINION

Before the Court is Plaintiff's Motion for Default Judgment. ECF No. 30. Having considered the Motion, exhibits, and applicable law, the Court concludes the Motion should be and hereby is **GRANTED**.

## BACKGROUND

This case dates to the golden days of pre-2008 profligate lending.[1] In November 2006, Rosalba Veloz borrowed $340,000 from Plaza Home Mortgage, Inc. Ms. Veloz secured her loan with a deed of trust creating a first lien on property located at 5120 Crestline Road, Fort Worth, Texas 76107 (the "Property"). When the housing bubble burst, financial institutions scrambled to aggregate and convey such instruments,

---

[1] The days when Americans saw familiar commercials for lending giants like "1%realtyonline.com," which touted "100 percent financing even with a 575 credit score." *See* Carmel Lobello, *5 Commercials for Subprime Mortgage Loans from Before the Financial Crisis*, THE WEEK (Jan. 11, 2015), https://theweek.com/articles/460145/5-commercials-subprime-mortgage-loans-from-before-financial-crisis (fourth video from the top). Or Lending Street, "the home of the zero-down home loan." *See id.* (third video from the top). The hallowed days when Ameriquest, one of the nation's largest lenders, adopted the slogan of "don't judge too quickly . . . we won't!" *See id.* (first video). The days when nothing seemed amiss when a "strawberry picker with an income of $14,000 and no English [proficiency] was lent every penny he needed to buy a house for $724,000." Michael Lewis, *The Big Short: Inside the Doomsday Machine* 97 (2010).

desperately attempting to squeeze any monetization potential the instruments possessed. Ms. Veloz's lien bounced around a bit—going from Plaza to Chase Bank and from Chase Bank to Pretium Mortgage Credit Partners—before landing with Plaintiff Wilmington Savings Fund Society, FSB.

Veloz defaulted in November 2008. When Wilmington sought to collect on its lien, it discovered it wasn't the only holder of ostensible rights in the Property. Enter the Defendants—a motley crew of individuals and legal entities with varying ties to the Property. It turns out Ms. Veloz had granted another $125,000 lien on the Property in March 2008. After that lien was foreclosed in July 2012, Veloz conveyed the Property to Defendant Yazbek "subject to" Wilmington's lien. After Veloz's November 2008 default on the $340,00 lien, Yazbek and her trust ("Crestline") "filed numerous fraudulent property records to frustrate Wilmington's right to foreclose." Wilmington overcame these obstacles and foreclosed in 2018, purchasing the Property for $525,000 pursuant to its credit bid.

Wilmington's headaches didn't go away after that, as evidenced by an abstruse post-foreclosure timeline. Not long after Wilmington purchased the Property, Yazbek sued Wilmington and its loan servicer to set aside the sale. After four arduous years, Wilmington was awarded summary judgment vis-à-vis its ownership of the Property. Shortly after that, Yazbek conveyed the property to Defendant Barron. Defendant Barron then conveyed the Property to Crestline by special warranty deed and executed another lien on the Property to Defendant ZNotes, LP. When Barron likewise defaulted, ZNotes sold the Property to Defendant Owlia Properties LLC in April 2022. Wilmington then sued to quiet title in August 2023.

After filing suit, Wilmington settled with ZNotes and Owlia, leaving Defendants Yazbek, Crestline, and Barron.[2] When Defendants evaded service, the Court authorized service-by-publication in December 2023.

---

[2] For clarity, the Court calls these remaining defendants "the Defendants" throughout this Order. *See* ECF Nos. 15, 29 (dismissing Owlia and ZNotes from this lawsuit).

When Defendants failed to respond to Wilmington's lawsuit, Wilmington asked the Clerk to enter their default. The Clerk did in February, prompting the present Motion.

## LEGAL STANDARD

Federal Rule of Civil Procedure 55 governs default judgments. If a defendant fails to "plead or otherwise defend" against a claim, the Clerk must enter default upon a requisite showing from the plaintiff. *See* FED. R. CIV. P. 55(a). If damages are readily calculable, the Court may enter default judgment upon timely motion from the plaintiff without conducting a hearing. *See id.* at 55(b). Still, "a party is not entitled to a default judgment as a matter of right, even where the defendant is technically in default." *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001) (cleaned up).

Consistent with Fifth Circuit policy favoring judgments on the merits, default judgments are highly disfavored. *See Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989). The default-judgment analysis is three-pronged. *First*, the Court asks if default judgment is procedurally proper. *See Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998).[3] *Second*, the Court "assess[es] the substantive merits of the plaintiff's claim and determine[s] whether there is a sufficient basis in the pleadings for the judgment." *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975); *see also Wooten v. McDonald Transit Assocs.*, 788 F.3d 490, 498 (5th Cir. 2015) (noting default judgments "must be supported by well-pleaded allegations and must have a sufficient basis in the pleadings" (cleaned up)). *Third*, the Court determines what relief is proper. *See Jackson v. FIE Corp.*, 302 F.3d 515, 524–25 (5th Cir. 2002). In doing so, the Court assumes the plaintiff's uncontested allegations are true,

---

[3]The Court answers this question with an eye toward six considerations: "(1) whether material issues of fact exist; (2) whether there has been substantial prejudice; (3) whether the grounds for default are clearly established; (4) whether the default was caused by good faith mistake or excusable neglect; (5) the harshness of a default judgment; and (6) whether the Court would think itself obliged to set aside the default on the defendant's motion." *Id.*

3

except those regarding damages. *See United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979).

## ANALYSIS

As noted above, the Clerk entered Defendants' default on February 23 and Wilmington moved for default judgment on April 16. *See* ECF Nos. 28, 30. But default judgments are highly disfavored. *See Sun Bank of Ocala*, 874 F.2d at 276. Thus, "a party is not entitled to a default judgment as a matter of right, even where the defendant is technically in default." *Lewis*, 236 F.3d at 767. Accordingly, the Court must still determine whether default judgment is warranted for Wilmington's claims against Defendants. As explained below, it is.

### A.   Default judgment is procedurally proper.

Because default judgments are highly disfavored, the Court must ensure Wilmington crossed its *t*'s and dotted its *i*'s procedurally. This isn't judicial nit-picking; it's a recognition of Fifth Circuit precedents favoring judgments on the merits rather than procedural technicalities. *See Sun Bank of Ocala*, 874 F.2d at 276. The Court's analysis is framed by the six *Lindsey* factors. *See* 161 F.3d at 893. As explained below, *Lindsey* supports default judgment here.

#### 1.   Material Issues of Fact.

Default judgments are improper where material issues of fact remain notwithstanding a defendant's default. *Lindsey*, 161 F.3d at 893; *see also id.* at 895 (considering only "purely factual material relating to the merits of the [claim]" (cleaned up)). No such issues exist here. As explained below, Defendants' default means the Court must assume the truth of Wilmington's allegations (save those relating to damages). *See generally Jackson v. FIE Corp.*, 302 F.3d 515, 525 n.9 (5th Cir. 2002). Yet Wilmington came to bat, providing ample evidence to support the allegations in its Complaint.

The lien at issue is governed by "the law of the jurisdiction in which the Property is located," here, Texas. *See* ECF No. 30-2. To prevail on a claim to quiet title in Texas, Wilmington must prove: (1) that it has an interest in specific property, (2) that it's title to the property is impacted

by Defendants' claims, and (3) that Defendants' claims are invalid or unenforceable. *Coleman v. Bank of N.Y. Mellon*, 969 F. Supp. 2d 736, 752 (N.D. Tex. 2013) (Lynn, J.). It does.

The pleadings and attached evidence establish Wilmington's title to the Property. Veloz executed a deed conveying a first and superior interest to Plaza (ECF No. 30-2), Plaza assigned it to Chase (ECF No. 30-3), Chase assigned it to Pretium (ECF No. 30-4), and Pretium assigned it to Wilmington (ECF No. 30-5). Wilmington obtained title to the property when it foreclosed on the lien in 2018. *See* ECF No. 30-14. The validity of that title has since been confirmed by a court of competent jurisdiction. *See* ECF No. 30-17. Wilmington thus establishes "an interest in specific property." *See Coleman*, 969 F. Supp. 2d at 752. And the pleadings and attached evidence verify that Defendants' actions have impacted Wilmington's title, *see* ECF Nos. 30-18, 30-20, 30-21, thus establishing the second element. *See Coleman*, 969 F. Supp. 2d at 752.

Turning to the third element, the pleadings and attached evidence establish the invalidity/unenforceability of Defendants' property conveyances. Despite judicial confirmation that Wilmington's title is valid, Defendants clouded the title in at least the following ways:

> (1) a warranty deed purporting to convey the property from Ms. Yazbek to Mr. Barron, recorded November 4, 2020; (2) a special warranty deed purporting to convey the property from Mr. Barron to Crestline West Trust/Merie Yazbek Trustee, recorded November 25, 2020; and (3) a scrivener's affidavit recorded August 11, 2021, "for the sole purpose of correct the grantee's name in the special warranty deed recorded November 25, 2020."

ECF No. 30 at 8 (cleaned up). As no disputes of material fact remain for Wilmington's claim, *see Coleman*, 969 F. Supp. 2d at 752, the first *Lindsey* factor favors default judgment. *See* 161 F.3d at 893.

    2.    <u>Substantial Prejudice.</u>

Default judgments are also improper if they would substantially prejudice a litigant's rights. *See Lindsey*, 161 F.3d at 893. Here, Defendants' refusal to engage the litigation process substantially prejudiced Wilmington's rights. Wilmington filed its Complaint on

August 29, 2023. *See* ECF No. 1. After trying in vain to serve Defendants via traditional means, Wilmington was forced to request leave to serve them by publication. *See* ECF No. 16. The Court granted Wilmington's request, resulting in perfected service upon all Defendants more than four months after Wilmington filed its Complaint. *See* ECF Nos. 18; 24–26. All told, Wilmington has been stymied in quieting title to the Property for almost a year—to say nothing of its headaches preceding this lawsuit. Needless to say, needless delay is substantially prejudicial. *See Sun Bank of Ocala*, 874 F.2d at 276–77. On the flip side, nothing indicates Defendants would be unfairly prejudiced by a default judgment considering they eschewed all previous opportunities to contest the allegations against them. Accordingly, this factor also supports default judgment. *See Lindsey*, 161 F.3d at 893.

   3. <u>Clearly Established Grounds for Default.</u>

Default judgments can only stand on bedrock; a foundation of sand will not suffice. Because default judgments are "resorted to by courts only in extreme situations," the slightest uncertainty as to the grounds for default will defeat judgment. *See Sun Bank of Ocala*, 874 F.2d at 276. But Wilmington has clearly established all grounds for default. *See* ECF No. 30 at 2–9; *see also* ECF Nos. 30-2–30-24. Because the grounds of Defendants' default are clear, this factor also supports default judgment. *See Lindsey*, 161 F.3d at 893.

   4. <u>Good Faith Mistake & Excusable Neglect / Harshness.</u>

While initially articulated as distinct, *Lindsey*'s "good faith mistake and excusable neglect" prong is inextricably intertwined with the "harshness" prong. All judgments are harsh for the losing party—default judgments even more so. But if the defaulting party defaulted because of a "good faith mistake" or "excusable neglect," a default judgment may be too harsh. *See CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 64 (5th Cir. 1992) (collecting cases to show examples of "excusable" neglect). Here, the record is devoid of any evidence suggesting "excusable neglect" caused Defendants' default. They were served with process (ECF Nos. 24–26) and had every opportunity to contest Wilmington's claims. They failed to do so.

6

Whatever "excusable" neglect may mean; it doesn't mean outright refusal to litigate. Indeed, the Fifth Circuit has clarified that neglect isn't excusable where there's a "clear record of delay or contumacious conduct." *Sun Bank of Ocala*, 874 F.2d at 277. And that's what Defendants have been by making no efforts to try this case despite Wilmington doing everything in its power to prosecute the lawsuit. The Court doesn't know why Defendants refused to litigate the case because they haven't entered an appearance or otherwise contacted the Court or Wilmington's counsel. Now-dismissed Defendants ZNotes, LP and Owlia Properties, LLC entered an appearance and settled with Wilmington. *See* ECF Nos. 15, 29. Had Mr. Barron, Ms. Yazbek, or Ms. Yazbek's trust done similarly, we may not be here today. Yet they opted to evade Wilmington instead, necessitating the instant Motion. As such, this factor also supports default judgment. *See Lindsey*, 161 F.3d at 893.

     5.    <u>The Court's Obligation to Set Aside Default Judgment.</u>

The final consideration under *Lindsey* asks "whether the court would think itself obliged to set aside the default on the defendant's motion." *See* 161 F.3d at 893. This is inherently subjective, as one court may "think" something different from another under the circumstances of a given case. In any event, considering every other factor from *Lindsey* favors default judgment, the Court would be disinclined to change its mind if Defendants moved for reconsideration. Accordingly, default judgment is procedurally proper under the *Lindsey* factors.

**B.**    **Default judgment is substantively proper.**

Default judgments must be warranted procedurally and substantively. *See Nishimatsu*, 515 F.2d at 1206. Having addressed procedural propriety, the Court now turns to the substantive merits of Wilmington's claims. Even accepting the Complaint's uncontested allegations as true, the Court must scrutinize the pleadings to determine if a default judgment is warranted. *See id.* As discussed in the Court's analysis of the first *Lindsey* factor, Wilmington establishes its claim for quiet title. *See supra*, pp. 3–5. Its claim is straightforward: Wilmington has rightful title to the Property, Defendants have unlawfully impacted the title with contemporaneous records, and those

7

records, while facially valid, are invalid and/or unenforceable considering Wilmington's rightful title. *See* ECF No. 1; *see also* ECF No. 30 at 7–8. If uncontested, even the simplest factual recitations may suffice to quiet title if they establish these elements. *See Coleman*, 969 F. Supp. 2d at 752 (collecting cases). Thus, the only thing remaining for judicial determination is the appropriate remedy for Wilmington's claim. *See Freeman*, 605 F.2d at 857.

### C. Wilmington is entitled to a declaration that it owns the Property.

Having established the elements of its claim for quiet title, Wilmington has little left to do. It doesn't seek money damages in this case. *See* ECF No. 1 at 7. Rather, it "prays for a judgment declaring [its] rights and for any and all other relief to which it is entitled." ECF No. 30 at 8. Specifically, Wilmington asks the Court to enter a declaratory judgment "(1) voiding all documents identified in paragraph 18 of th[e] complaint, and declaring (2) defendants have no rights, title, or interest in the property, and (3) Wilmington has a valid right, title, and interest to the property and is the rightful property owner." ECF No. 1 at 7. Considering the Complaint's uncontested allegations and verifying evidence support Wilmington's claim, it is entitled to this relief.

## CONCLUSION

This case exemplifies a "problem with money" well-articulated by Michael Lewis: "What people did with it had consequences, but they were so remote from the original action that the mind never connected the one with the other." Lewis, *supra* n.1., at 234. Here, a munificent granting of liens on the Property metastasized over sixteen years, resulting in multiple lawsuits and thousands of dollars in attorneys' fees. Fortunately for Wilmington, it's rights to the Property can be elucidated for the reasons outlined above. Accordingly, the Court **ENTERS** default judgment in favor of Plaintiff Wilmington Savings Fund Society, FSB. In doing so, the Court **DECLARES** that all documents identified in the Paragraph 18 of the Complaint are **VOID** and legally unenforceable. The Court further **DECLARES** that Defendants have no rights, title, or interest in the Property located at 5120 Crestline Road, Fort Worth, Texas 76107. Finally, the Court

**DECLARES** that Plaintiff Wilmington Savings Fund Society, FSB is the exclusive owner of valid rights, title, and interest in said Property, and is the rightful owner of said Property entitled to full possession thereof.

**SO ORDERED** on this **1st day** of **July 2024.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE